Bernard MITCHELL, Appellant,

v.

UNION PACIFIC RAILROAD CO., a Corporation, et al., Appellees.

No. 15068.

United States Court of Appeals
Ninth Circuit.

March 30, 1957.

½

Monroe & Chula, George H. Chula, Santa Ana, Cal., for appellant.

Malcom Davis, Los Angeles, Cal., for appellees.

Before STEPHENS, LEMMON, and FEE, Circuit Judges.

LEMMON, Circuit Judge.

An alien who lost a valuable trained dog through a railroad's admitted carelessness is here complaining that he was cavalierly hustled out of the court below by a summary judgment.

A full trial, with ample opportunity for the cross-examination of witnesses, can no doubt clear up many, if not all, of the uncertainties, contradictions, and errors that have crept into this case.

Poor Pudsy died from lack of ventilation in a locked baggage car. His master's lawsuit should not be permitted to die from lack of ventilation in a summary-locked court of law. Let there be light.

1. *Statement of Facts*

A summary of the appellant's statement of facts, which the appellee concedes "is generally correct", follows:

For the purpose of exhibiting a trained black and white fox terrier named "Pudsy", the appellant and his wife, accompanied by the dog, left their home town in Ireland to come to the United States, in June, 1952. The intention was to show "the dog on television, in the movies and displaying him to the children of the United States".

The appellant had purchased in Ireland his railroad tickets from New York to Los Angeles, but the ticket for the dog was solely to New York, since the agency in Ireland had never shipped a dog as far as California.

In New York the appellant inquired at the railroad station "all about the shipment; * * * he had never shipped [the dog] on this train before so he wanted to know". The appellant "asked the man further if he would be able to get in beside the dog whenever he wanted to and the agent of the railroad told him that he would. In New York no slip of valuation was signed."

The appellant purchased a dog crate, which he was told would be needed for shipping the animal.

In Chicago, the appellant asked his wife "to find out the particulars of what I have to do with this dog before I give

him over". He then went to a rest room, taking the dog and the crate with him.

In the meanwhile, the appellant's wife went to the baggage counter at the Chicago Passenger Terminal to make the inquiries.

When the appellant came back, "the man who was talking to his wife called him over by the baggage counter and asked [him] if it was his dog, and he told him, 'Yes'."

The appellant informed the baggage man of the Chicago and North Western Railway Company that Pudsy was a valuable trick dog, that he had brought him all the way from Ireland, and that he wanted "to see him safe". The baggage clerk advised the appellant "that the company would be careful with the dog and that he should put him in the crate". After putting the dog into the crate, the appellant said:

"Will I be able to get in to see him? I want to accompany this dog on the train all the way down to Los Angeles. Can I do that? I want to know who is in charge to look after the dog while he is on that train and I want to be there. I want to be there to look after that dog and to give him any attention that he wants, such as fresh air or a little water or a little something or ventilation and maybe a little walk, if the train stops. If I get that opportunity, I want to know all that. Can I do that?"

The man answered, "Yes, you will be able to do that."

The appellant then asked whether there would be a man in charge and he was told that there would be, and that the appellant "would be able to get in to see Pudsy".

The appellant followed the dog to the baggage car, and, after straightening the crate, which was upside down, on the baggage wagon, assisted in lifting the crate into the baggage car. He inquired whether he would be able to "get in with the dog and would there be a man in charge of the baggage car looking after the dog. He was told that there would be and in answer to his further inquiry as to whether he could get in and look after his dog * * * [h]e was informed by the agent of the [appellee Chicago and North Western] that he would be able to get in to see his dog".

In an affidavit filed by the appellant in opposition to the motion for a summary judgment, the following statements appear:

"That the said dog, 'Pudsy', was not carried as ordinary baggage under [the appellant's] ticket, but a separate charge was paid to the Chicago Northwestern System for the carriage of the said dog named 'Pudsy'. That said dog, 'Pudsy', was not baggage carried on a passenger train as free baggage, checked through on a passenger fare. That a fare of Eight Dollars and Thirty-three Cents ($8.33), was paid for the transportation of the dog, * * *. That said dog * * * was delivered to the [appellees] in a strong crate fitted with a handle."

At the time of the shipment of the dog, the appellant did not sign any valuation slip, nor did he have any information of any such slip being signed by anyone until after he arrived in Los Angeles.

In this connection, it should be pointed out that E. R. Foster, a baggage check clerk of the appellee Chicago and North Western at the Chicago Passenger Terminal of that company, made a detailed affidavit to the effect that *the appellant himself* stated to him that he desired to check his dog through from Chicago to Los Angeles on the "City of Los Angeles No. 103", commencing that evening; that *the appellant* exhibited a passenger ticket entitling him to passage on that train; that in accordance with the provisions of Western Baggage Tariff No. 24-13, Foster asked *the appellant* to make out the valuation slip required *and saw him do so in his own handwriting*:

"I actually saw *Mr. Bernard Mitchell* write in the figure '25' in the line under the printed statement,

'Is valued at not exceeding', and also saw *him* write out *his* name and address in the blank spaces farther down on the valuation slip. I then punched *his* ticket to indicate that baggage had been checked on the ticket and returned the ticket to *him.*" [Emphasis supplied.]

The appellee grudgingly concedes that there are "certain alleged contradictions between the affidavits filed in support of the Motion for Summary Judgment and the interrogatories and affidavits submitted by the Appellant and also the depositions of Appellant and his wife"; that "There are some discrepancies in this respect"; and that Foster's "recollection was apparently faulty and apparently it was really Mrs. Mitchell who performed this act in the presence of her husband".

Our own independent study of the record convinces us that the above contradictions are not only "alleged" and "apparent", but are *real and palpable.* Whether they are *material* will be discussed hereinafter.

Continuing our narrative, we find that it was *Mrs.* Mitchell who signed what "purported to be a valuation slip". She was asked by the baggage clerk to fill in her "husband's name and destination" on the ticket. She did so. She deposed that the baggage check clerk also told her:

" 'Here, put 25 here'."

Mrs. Mitchell's statement continues:

"I put '25' down and gave it back to him, and the man never said what it was or what it wasn't.

"Q. Now, did you read that slip? A. I didn't have time to hardly write it, let alone read it, Mister."

At the time of her obeying the direction of the baggage clerk, the latter had indicated that he was in a big hurry, and Mrs. Mitchell was merely acting upon his direction without any notification or understanding of what was intended by the "25". At no time did either the appellant or his wife have any actual notice of any limitation of liability, nor were they actually informed of any such limitation on behalf of the railroad.

After the train left Chicago, the appellant attempted to "check on his dog, and for several hours and contrary to what he had been previously advised, he was told that the baggage car was locked and that he could not get in to water, care, and feed his dog, and that there was no one in the baggage car to care for the dog."

For want of water, food, adequate ventilation, and other attention, Pudsy died. The District Court found:

"When [the appellant] attempted to feed and water the dog at Clinton, Iowa, during the late evening of June 24, 1952, he found that said dog was dead; that the death of said dog was caused by lack of ventilation in the baggage car, due to the negligence of the [appellee] Chicago North Western Railway Co., on the lines of which railroad all transportation to that point had taken place; that the [appellee] Union Pacific Railroad Co. was not connected in any way with the transportation or handling of the dog."

2. *Statement of the Case*

On June 18, 1953, the appellant filed a "Complaint for Damages", based upon the death of the dog. Three causes of action were alleged.

The first cause of action set forth that when the appellant delivered the dog to the appellees in Chicago, he was advised by the agents of the appellees that one of their agents would be in the baggage car with Pudsy and would care for him; that the appellant would have an opportunity to care for the dog himself, by being allowed access to the car; that relying upon those statements he allowed the animal to be placed into the appellees' custody; that when the appellant boarded the train and requested access to the car in which the dog was being carried, he was advised that no one was in charge of the car, and that it was sealed and no one could enter it. Whereupon the appellant begged the appellees' agents to allow him access to the bag-

gage car to care for the dog, but the agents denied him access to his dog. The appellant relied upon the agents' statements that he would be able to care for his dog and that some one would be present in the car to care for the dog. If such statements had not been made he would not have allowed the animal to be transported by the appellees. As a result of lack of care, the dog died.

The first cause of action alleged damage in the sum of $100,000 "as a direct and proximate result of the fraud, concealment and subsequent loss of" the dog; and averred "that by reason of said wilfulness, wantonness and flagrant indifference, [the appellant] demands as exemplary punitive damages" $100,000.

The second cause of action is based upon an allegation of negligence, and the third cause of action alleges "wilful, wanton and flagrant indifference to the consequences", in connection with the appellees' alleged failure to "furnish suitable care, supervision for said dog while in transit," etc. In the second and third causes of action, $100,000 actual and $100,000 exemplary and punitive damages are demanded for each cause of action.

The answer of appellee Chicago and North Western Railway Company, filed on November 2, 1953, admitted the appellant's delivery of the dog to the appellee at Chicago, and that the appellee agreed to convey the animal on the same train in which the appellant was riding, to Los Angeles. All other allegations of the complaint were denied. In addition, the appellee alleged that it had duly filed with the Interstate Commerce Commission and had kept open to public inspection, etc., its Western Baggage Tariff 25–13, effective June 15, 1948, Rule 7–G of which was as follows:

"The limit of value on an uncrated dog will be * * * $25.00. Single shipments exceeding that value must not be accepted for transportation in baggage service. This does not preclude a passenger making two or more shipments, each shipment separately valued at not exceeding

* * * $25. The limit of value on one or more dogs, shipped in one crate, will be * * * $25, unless the shipper declares an increased valuation at time of checking and pays $1.00 for each * * * $100.00 or fraction thereof over the carrier's liability of * * * $25.-00. Where passengers make shipment of two or more crates, a separate valuation will be required on each crate. Declaration of value exceeding * * * $300.00 per crate will not be permitted."

The answer further alleged that the appellant did not declare a greater value than $25 for the dog, nor did the appellant make any payment or offer of payment of the rate set forth in the above tariff for any such declaration of greater value; that on the contrary, the appellant, in order to secure the minimum rate, signed a declaration that the dog was valued at not more than $25, etc.; that under the provisions of the Federal Interstate Commerce Act it is unlawful for the appellee to deviate from the provisions of the tariff, etc., and that therefore the appellant's recovery, if any, should be limited to $25.

It might here be stated that, in this same Western Baggage Tariff, Rule 6(c) (1) reads as follows:

"They [domestic and trained animals] must be accompanied by owners or caretakers who present valid transportation and who will provide proper facilities for loading and unloading, feeding and watering, whenever necessary."

And Rule 7(1) (A), (I) and (J) provides:

"(A) When accompanied by a passenger presenting valid transportation, Dogs not exceeding twenty-five dollars ($25.00) in value (see paragraph (G) [supra] ), and which are not intended for other persons, nor for sale, may be transported in baggage service, subject to the conditions shown in Paragraphs (B) to (J), inclusive:

*       *       *       *       *

"(I) Dogs used in producing a theatrical performance or other public entertainment, indoors or out of doors, will be considered as public entertainment paraphernalia, provided they are carried in strong crates or other substantial containers fitted with handles, and will be handled under the provisions of Rule 6, paragraph (C).

"*Note*—Dogs intended for exhibition, bench shows, field trials, races, coursing matches, or any uncrated dog, will not be regarded as public entertainment paraphernalia, but will be handled in accordance with the provisions of this rule, except that dogs intended for exhibitions or bench shows may be handled in special baggage cars in accordance with special baggage car rules.

"(J) Dogs must be claimed immediately upon arrival at destination. Carriers do not assume obligation to store or care for Dogs at stations or wharves. *Passengers must attend to feeding and watering Dogs en route and at stations or wharves.*" [Emphasis supplied.]

On December 22, 1953, the appellees filed a motion for a summary judgment in favor of the appellant for $25. On December 16, 1955, the District Court filed its Findings of Fact and Conclusions of Law, which have already been quoted in part, and also handed down a summary judgment in favor of the appellant against the Chicago and North Western Railway Company, one of the appellees, for $25, with costs.

From that judgment, the present appeal has been taken.

3. *As a Matter of LAW, the Appellant's Wife Was Not Necessarily His Agent When She Wrote "25" on the Valuation Slip.*

The appellees assert "that as a matter of law there is no difference between these two sets of facts [*i. e.*, whether (1) *Mrs.* Mitchell signed the valuation slip, or (2) *Mr.* Mitchell signed it] and that Mr. Mitchell is just as much bound by the actions of Mrs. Mitchell, performed in his presence and later ratified by him when he handed over the dog for placing on the train, as if he had done the same acts himself."

Whether, under the pleadings, exhibits, and depositions, Mrs. Mitchell was the agent of her husband when she placed the cryptic "25" on the ticket, is a question that we will take up in the ensuing section. At the moment, we will consider briefly the question of whether, because of the *marital relationship alone,* there is any presumption that Mrs. Mitchell was acting as her husband's agent when she signed his name to the valuation slip.

[1] It is hornbook law that there is no such legal presumption.

In 41 C.J.S., Husband and Wife, § 65b (2) (a), page 537, it is said:

"The agency of the wife for the husband may be implied or inferred from the acts and conduct of the husband or from the facts and circumstances of the case. *It must be an agency in fact,* shown to be so by reasonable deductions drawn from disclosed facts or circumstances, and can rise no higher than its source, that is, the acts and circumstances from which it is deduced. It cannot exist contrary to the will of the husband, and must be based on acts for which the husband is responsible and on a natural and reasonable construction of such acts." [Emphasis supplied.]

The question of agency generally, of course, is one of fact. Riverside Fibre & Paper Co. v. O. C. Keckley Co., 7 Cir., 1929, 32 F.2d 23, 26.

4. *The Limited Record Before Us Does Not Establish, As a Matter of FACT, That Mrs. Mitchell Was Acting as Her Husband's Agent When She Signed His Name to the Valuation Slip.*

We next address our attention to the question of whether Mrs. Mitchell was acting as her husband's agent when she placed her "husband's name and destination" and the crucial "25" on the valuation slip. She deposed that when she

wrote on the slip, her husband "was 'way over there, doing something with the dog'", at a distance from her that counsel agreed would be about 30 feet, according to what they were able to gather from her testimony. Mitchell himself testified that he didn't see her write anything on the valuation ship, and that she told him what she had done only after "my dog was dead." Indeed, he added, "She must have wrote it while I was away".

Mitchell further said that he had no conversation with his wife while he was at the baggage counter: "The man was in a hurry and rushing us on." The appellant estimated the distance between his wife and himself at the baggage counter as being 15 to 20 feet.

Nor did the appellant authorize his wife *in advance* to sign any document, or to affix his name and destination. If there was any agency at all, it was merely to *inquire*—"to find out the particulars of what I have to do with this dog before I give him over." He did not authorize his wife, either expressly or impliedly, to affix his name to any document, much less, specifically, to bind him by any valuation of the dog.

Indeed, in his affidavit in opposition to the motion for a summary judgment, the appellant swore "that at no time herein was the Plaintiff advised, nor did he know, that he had a choice to place any valuation whatsoever upon his dog, 'Pudsy', by the Defendants herein."

If it be argued that the depositions of the appellant and his wife are unsatisfactory, we readily agree. So is the affidavit of the baggage check clerk, when parsed for gender. It is precisely such uncertainties that render a summary disposition of the case erroneous.

5. *Even If Mrs. Mitchell Is Regarded as the Appellant's Agent, There Is Evidence That She Was Unfairly Prevented From Realizing What She Was Signing.*

There is testimony that the baggage check clerk "high-pressured" Mrs. Mitchell into signing a document so that she "didn't have time to hardly write" her name, "let alone read it"; that the clerk urged her to hurry; that he told her to put down "25"; that she never saw what the paper was "or anything else". When it is remembered that she and the clerk were not on an "equal footing" under the circumstances, it is plain that a court should desire to probe into the matter further.

In New York, New Haven & Hartford Railroad Co. v. Nothnagle, 1953, 346 U.S. 128, 135–136, 73 S.Ct. 986, 990, 97 L.Ed. 1500, where a similar $25 limitation of liability was invoked against a passenger, the Court said:

> "But only by granting its customers a *fair opportunity* to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained. [Cases cited.] Binding respondent by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice; such an arrangement would amount to a forbidden attempt to exonerate a carrier *from the consequences of its own negligent acts.* [Cases cited.] 'The great object of the law governing common carriers was to secure the utmost care in the rendering of service of the highest importance to the community. A carrier who stipulates not to be bound to the exercise of care and diligence "seeks to put off the essential duties of his employment." *It is recognized that the carrier and the individual customer are not on an equal footing.* "The latter * * * cannot afford to higgle or stand out and seek redress in the courts."'" [Case cited.] [Emphasis supplied.]

While we recognize that the facts in Nothnagle were not the same as those in the instant case, we believe that the principles there announced should guide us here. In the following footnote, the Supreme Court there distinguished three

cases heavily relied upon by the present appellee, which decisions are equally inapplicable to the instant case:

"12. Boston & Maine R. Co. v. Hooker, 1914, 233 U.S. 97, 34 S.Ct. 526, 58 L.Ed. 868, and New York Central [& Hartford] R. R. Co. v. Beaham, 1916, 242 U.S. 148, 37 S. Ct. 43, 61 L.Ed. 210, cannot control this case. *Neither decision involved the Act as amended by the 1915 and 1916 legislation;* both dealt with *free baggage checked through on a passenger ticket;* the carrier in both cases had supplied some notice of its limitation of liability. In Galveston, H. & S. A. R. Co. v. Woodbury, 1920, 254 U.S. 357, 41 S.Ct. 114, 65 L.Ed. 301, the sole issue raised or considered *related to the interstate nature of the passenger's journey.*" [Emphasis supplied.]

6. *There Is Evidence That the Appellant Himself Knew Nothing of His Wife's Signing Until After the Dog .was Dead.*

The appellant testified that his wife informed him of her writing on the valuation slip only "After all this had been done, my dog was dead".

■ Such *ex post facto* knowledge, of course, under the facts of this case cannot support any theory of ratification by the appellant.

In Fitch v. Carpenter, 1945, 70 Cal. App.2d 827, 829, 831, 832, 161 P.2d 824, 825, the Court said:

"The agreement pleaded by defendant as a limitation upon his liability consisted of a provision in a bill of lading that the value of the property did not exceed ten cents per pound. Floyd Fitch, 16-year old son of plaintiffs, signed his own name to this declaration of value in the bill of lading. Plaintiffs filed an affidavit denying the authority of their son to enter into an agreement on their behalf and the due execution by them of the alleged agreement limiting defendant's liability.

\* \* \* \* \*

"Being without knowledge of what their son had signed, plaintiffs did not ratify his act nor could they be held estopped under the circumstances to deny his authority.

\* \* \* \* \*

"There was no evidence that plaintiffs had any knowledge that the sum charged by defendant was at the rate fixed for the shipment of goods at a valuation of ten cents per pound, nor was there any evidence that they had any knowledge whatever as to the basis of defendant's rates. Not having entered into or even discussed any agreement or arrangement to limit defendant's liability, they had a right to assume that defendant was undertaking to transport the goods at their true value and that he was charging his customary rate therefor. Although defendant's tariffs had been filed with and approved by the Railroad Commission and the charges which he made were in accordance therewith, and were applicable to the shipment of goods at a valuation not to exceed ten cents per pound, *the payment by plaintiffs of the minimum rate did not constitute an agreement upon their part to a limitation of defendant's liability.* \* \* \*

"The argument that as plaintiffs had the benefit of the lower rate they should bear the consequences which followed the acceptance of that rate is without force, inasmuch as there was no evidence that they had any knowledge that defendant's charges were based upon a restricted liability." [Emphasis supplied.]

7. *Conclusion.*

We hold that as a matter of *law,* Mrs. Mitchell was not necessarily the appellant's agent when she wrote "25" and his name and destination on the valuation slip; that the meager record before us does not establish, as a matter of *fact,* that she was acting as her husband's agent when she wrote on the

**606**

valuation slip, but, on the contrary, suggests an opposite conclusion; that even if she were to be regarded as his agent, there is evidence that she was unfairly prevented from realizing what she was signing; and that there is evidence that the appellant himself knew nothing of his wife's signing until after Pudsy was dead.

Accordingly, the summary judgment of the Court below is vacated, and the cause is remanded with instructions that the parties be accorded a full and ordinary trial on the merits.

Judgment vacated and case remanded, with instructions.