SEABOARD PROPERTIES, INC.,
Appellant,

v.

Herbert H. BUNCHMAN, Appellee.

No. 18023.

United States Court of Appeals
Fifth Circuit.

May 17, 1960.

Charles A. Kimbrell, Miami, Fla., Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for appellant.

Claude Pepper, Allen Clements, Jr., Neal P. Rutledge, Miami, Fla., for appellee.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is a tort action for damages suffered by the appellee when he broke his back in a fishing boat on January 22, 1955, in an accident that occurred on navigable waters about a mile off the coast of Florida. Jurisdiction is based on diversity of citizenship, 28 U.S.C.A. § 1332, and, insofar as a maritime tort is involved, on the Saving to Suitors Clause, 28 U.S.C.A. § 1333(1). The only issue is whether the questions of agency and of assumption of risk should have gone to the jury. We find, in the circumstances of this case, that these were proper questions for the jury.

Appellant, Seaboard Properties, Inc., is a Florida corporation that owns and

operates the Ocean Reef Club, a luxurious resort hotel on the Atlantic Ocean at Key Largo, Florida. The Club's facilities include a hotel, cottages, two restaurants, a bar, yacht harbor, airport, golf courses, swimming pool, docks, boats, and fishing guides. The Club caters to sportsmen and advertises that it has complete facilities "for the Angler", including "bone fishing guides in residence".

Plaintiff-appellee, Herbert H. Bunchman, was a director and treasurer of Crane Company of Chicago, Illinois. He and several other directors of the company held their January 1955 directors meeting at the Ocean Reef Club as guests of William L. McKnight, one of the directors. McKnight made all the arrangements for their accommodations with Ben Atherton, the manager of the Ocean Reef Club. Atherton told McKnight that a deep sea boat and some bonefishing boats with guides would be available for the guests. After the directors left, the Club mailed McKnight its bill for all the accommodations, services, and facilities furnished the directors, including a charge for the boats and guides furnished.

When the directors of Crane Company arrived Friday evening, January 21, 1955, they met in the suite of the president of the company to plan the activities for the next day. The dockmaster for the Ocean Reef Club, an admitted employee of Seaboard, came to the room and explained what fishing facilities were available. There were only two boats for bonefishing. The directors drew straws to determine who would use these boats the next day. Bunchman and Vincent Rumely drew the winning straws. The dockmaster assigned Jack Wiggins as Bunchman's guide and Olin Perdue as Rumely's guide.

The next morning Seaboard's dockmaster met Bunchman and Rumely and introduced them to their guides. This was the first time Bunchman had even seen Wiggins. They did not discuss the price to be charged for Wiggins' services or the charges for the use of the boat.

Each skiff for bonefishing was a light, fourteen-foot, open craft with a flat bottom, built out of fiberglass in the shape of a rowboat, and powered by an outboard motor. The guide sits at the stern operating the motor and the guest sits near the bow.

Weather conditions were unfavorable when the two skiffs left the docks. It was a windy day, and the water was rough. An expert witness from the United States Weather Bureau testified that the wind velocity that day was about 23 miles an hour. Small craft warnings for craft up to 50 feet in length are posted when the wind reaches a velocity of 25 miles an hour. Witnesses described the water as "rolling pretty good", "very rough", "very choppy", and "darn rough". McKnight's 54-foot deep-sea fishing yacht could not go out into the Gulf stream and was forced to stay close to shore. The water was shallow within a mile or more of shore and especially choppy therefore in a high wind.

Rumely's boat left the dock first. A few minutes later Bunchman's boat left. As soon as the skiffs hit open water, the passengers learned that they were in for a rough ride. Both Rumely and Bunchman had trouble balancing on their seats. Rumely testified that his boat was going "at a speed that was too fast for the water", and that he was just on the point of telling his guide that he "couldn't take it" when the accident happened to Bunchman. Hanging on to both sides of the skiff, Bunchman asked Wiggins to "take it easy". Wiggins did not slow down the boat. A few minutes later Bunchman was thrown in the air when the boat hit an especially high wave. He crashed down again on the seat as the boat rose to meet his fall. His back was broken.

Bunchman sued Seaboard, alleging that his injuries were caused by: (1) the negligent operation of the boat by Seaboard's employee, Wiggins; (2) Seaboard's providing a boat that was un-

safe under the prevailing conditions for the use contemplated; and (3) Seaboard's failure to warn a guest of the dangers involved.

The case was tried to a jury. Seaboard requested a directed verdict for the reasons that (1) Wiggins was not their agent but an independent contractor and (2) Bunchman assumed the risk. This motion was denied. All issues were submitted under proper instructions to the jury which returned a verdict of $45,000 for Bunchman. Seaboard made no complaint as to the trial judge's charges to the jury. Seaboard's motion for a new trial was denied. The only error Seaboard raises in this appeal is the district judge's refusal to direct a verdict in their favor.

### I.

While the power to direct a verdict should, indeed must, be exercised where the state of the evidence demands it, it should be exercised only when the evidence and the inferences from the evidence are such that reasonable men could reach only one rational conclusion. Lowry v. Seaboard Airline R. Co., 5 Cir., 1948, 171 F.2d 625; Woodward v. Atlantic Coast Line, R. R., 5 Cir., 1932, 57 F.2d 1019. Generally speaking, the question of whether an agency relationship exists is a question of fact to be resolved by the jury. Bogue Electric Mfg. Co. v. Coconut Grove Bank, 5 Cir., 1959, 269 F.2d 1; Gilmore v. Royal Indemnity Co., 5 Cir., 1956, 240 F.2d 101. See also Mitchell v. Union Pacific R. Co., 9 Cir., 1957, 242 F.2d 598; Pacific Can Co. v. Hewes, 9 Cir., 1938, 95 F.2d 42; Riverside Fibre & Paper Co. v. O. C. Keckley Co., 7 Cir., 1929, 32 F.2d 23; Denton v. Brocksmith, 5 Cir., 1924, 299 F. 559.

Seaboard denied the existence of any agency relationship. Seaboard points out that Wiggins paid for his room and board, gasoline, and supplies for the boat; that he was not carried as an employee on the records of Seaboard; that he determined where or how to fish. Seaboard says also that the guest and not the Club paid him by the job.

Far from being determinative of the question of whether Wiggins was an agent, this evidence points up the basic factual dispute between the parties that is properly settled by a jury, not by a trial judge. There is as much or more evidence presented by the appellee from which reasonable men might conclude that Wiggins was an employee of Seaboard. The skiff in which Bunchman was injured was licensed in the name of the Club and was owned by the defendant.[1] The Club advertised bonefishing with guides as one of the services offered its guests. Wiggins lived on the hotel premises, ate with the regular hotel employees, and the only persons whom Wiggins took fishing were guests of the hotel. The Club's dockmaster made reservations for Wiggins; the hotel management required him to "keep track of" the bookings made for him; the guests were usually billed by the hotel for the guide's services, and the guides often got their money from the hotel before payment of the bill by the guest. The management exercised control over Wiggins in a number of ways. He was required to be available as guide, keep track of bookings made by the hotel, not get drunk around the premises, and be polite and considerate to the guests of the Club. He had to report to the docks and pick up hotel guests whenever the Club's dockmaster wanted him. He had to maintain proper equipment for the boat. If his services were not satisfactory, he could be dismissed.

In the circumstances of this case reasonable minds might well infer that Wiggins was an employee of the hotel.

---

1. Seaboard contends that the Club had sold the boat to Wiggins. Part of the money due him for his services was retained as payments on the boat. The money retained by the hotel was described as "skiff rent" by the Club manager. Title to the boat was never transferred to Wiggins. When he quit working for the club he left the boat there and received a refund of a portion of the money he had paid on the boat.

Under Florida law, however, liability of a principal is not dependent upon the *actual* authority of an agent. The principal is bound as well by the *apparent* authority of the agent. In Thomkin Corp. v. Miller, 1945, 156 Fla. 388, 24 So.2d 48, 49, the Supreme Court of Florida stated:

"The rule is settled in this State that a principal is bound by the acts of his agent. The authority of the agent may be real or apparent and the public may rely on either unless in the case of apparent authority the circumstances are such as to put one on inquiry. The agent's authority may be * * * inferred from the related facts of the case."

See also Stuyvesant Corp. v. Stahl, Fla. 1952, 62 So.2d 18 [2] and Van Engers v. Hickory House, Inc., Fla.App.1958, 104 So.2d 843.

"This doctrine of apparent authority extends to hold the principal liable for tortious acts of the agent as well as for contractual acts within the scope of such authority."

"Whether or not an act or contract is within the scope of an agent's apparent authority is to be determined as a question of fact, from all the circumstances of the particular business and transaction." 1 Fla.Jur., Agency, Section 34.

■ Seaboard's denial and Wiggins' denial of the existence of any agency relationship is not conclusive under Florida law. Standard Oil Co. v. Nickerson, 1931, 103 Fla. 701, 138 So. 55; Watkins v. Sims, 1921, 81 Fla. 730, 88 So. 764. There is sufficient evidence to contradict these denials and create a factual issue to be submitted to the jury for their determination. Stuyvesant Corp. v. Stahl, Fla.1952, 62 So.2d 18.

■ Considering all the circumstances, the question whether Wiggins was serving the hotel, either under actual authority, or within the apparent scope of his authority, was a proper issue for the jury.

## II.

Assumption of risk is a jury question unless it can be said as a matter of law that the plaintiff assumed the risk. Prosser, Torts, Section 55 (2d ed. 1955). Federal courts and Florida courts have often declared that it is a jury question whether a plaintiff, with knowledge and appreciation of the danger, voluntarily assumed the risk. McGovern v. Philadelphia & Reading Ry. Co., 1914, 235 U.S. 389, 35 S.Ct. 127, 59 L.Ed. 283; City of Amarillo v. Copeland, 5 Cir., 1954, 218 F.2d 49; Byers v. Gunn, Fla.1955, 81 So.2d 723; Bartholf v. Baker, Fla.1954, 71 So.2d 480; Brady v. Kane, Fla.App. 1959, 111 So.2d 472.

The gist of Seaboard's argument is that Bunchman, a college graduate and a successful businessman, was intelligent enough to have realized the dangers inherent in riding in a small boat. Seaboard relies on Lockhart v. Martin, 1958, 159 Cal.App.2d 760, 324 P.2d 340. In that case the court held that it was a matter of common knowledge that the movement of small water craft is constantly affected by the waves and made unsteady regardless of the care exercised in their operation. The Lockhart case is distinguishable. There the plaintiff was an experienced fisherman and had fished many times from the boat on which the injury occurred. There is no evidence indicating that Bunchman knew or should have known of the dangers involved. Bunchman was from Chicago. He had never been on the Atlantic Ocean, or open water, in a small boat. Neither Bunchman nor any of the other directors had been bonefishing before, a sport involving the use of a small boat in the

---

2. In the Stuyvesant case the plaintiff, a guest at the defendant's hotel, was injured by an automobile driven by the doorman's assistant. The assistant parked cars for the hotel doorman. The doorman paid the hotel for his concession, so it was argued that the assistant was an employee of an independent contractor. The court held the hotel liable on the theory that the doorman's assistant had the authority or apparent authority to act for the hotel in parking the automobiles of hotel guests.

open coastal waters of the Atlantic Ocean.

In denying Seaboard's motion for a new trial, the trial judge stated: "I submitted it [the case] to a very intelligent jury here, I thought, and they have settled it. I think this unique sort of case was a typical case for the jury under appropriate instructions." We agree.

Affirmed.