**PLANTERS MANUFACTURING COM-
PANY, Plaintiff,**

v.

**PROTECTION MUTUAL INSURANCE
COMPANY, Defendant.**

No. DC6328.

United States District Court
N. D. Mississippi,
Delta Division.

Aug. 18, 1965.

Keady, Campbell & DeLong, Greenville, Miss., Maynard, FitzGerald & Maynard, Clarksdale, Miss., for plaintiff.

Robins, Davis & Lyons, Minneapolis, Minn., Brewer, Brewer & Luckett, Clarksdale, Miss., for defendant.

CLAYTON, District Judge.

This action was brought by Planters Manufacturing Company, a Mississippi corporation, against its non-resident insurer, Protection Mutual Insurance Company, to recover on an insurance policy issued by the defendant on the buildings of plaintiff's soybean and cottonseed processing plant in Clarksdale, Mississippi. Jurisdiction rests on diversity of citizenship, and trial was to the court and jury. The policy, which was not in dispute, protected against losses arising from explosions, as well as other risks, and the one issue on liability was whether plaintiff's bean storage house had been partially destroyed by an explosion as plaintiff contended. The amount of damage (more than $193,000) was not seriously disputed. Defendant denied that an explosion had occurred and sought to demonstrate that the beanhouse collapsed as a result of structural failure brought on by overloading, an uninsured risk. At the conclusion of a five day trial, defendant moved for a directed verdict in its favor, which was refused, and the jury returned a verdict for plaintiff. Defendant filed a timely motion for judgment in accordance with its motion for a directed verdict or, in the alternative, for a new trial, pursuant to Rule 50, Federal Rules of Civil Procedure. Briefs were submitted and in addition the court later heard oral argument on this motion, which is now for disposition.

The structure with which this action is concerned was used by plaintiff for the receipt and storage of soybeans prior to processing. The beanhouse was approximately 340 feet long by ninety feet wide, with vertical side walls thirteen feet high. The roof, sloping up from the sides at a forty-five degree angle, was topped by a narrow structure on the ridgeline which ran the length of the building. This structure, called the monitor, was ten feet high and the peak height of the beanhouse, including the monitor, was sixty-three feet. The principal load-carrying members were steel trusses bolted to a concrete foundation at twenty foot intervals. On these trusses were fastened corrugated steel sheets, inside and outside, to form double side walls. The roof consisted of corrugated steel sheets and there were no partitions in the interior. The floor was a concrete slab.

Loading of the beanhouse was accomplished by dumping truck loads of beans into a pit near the south end of the building. Auger-type conveyors, on the Archimedes screw principle, transported beans from the pit to the base of an elevator which was about ninety feet south of the beanhouse. The elevator discharged the beans at the top onto a belt conveyor which carried them into

the beanhouse at monitor level and, once inside, transferred them into a U-shaped trough eighteen inches deep. The trough, or conveyor box, extended the length of the monitor and had controllable spouts in its bottom at five foot intervals. A sixteen inch auger-type conveyor lay in the bottom of the conveyor box and moved the incoming beans from south to north. Selective piling of the beans on the floor of the beanhouse was achieved by opening the desired spout.

Removal of the beans as they were needed was done with an auger-type conveyor in a tunnel under the bean pile. When beans were required, gates in the tunnel were opened and the auger-conveyor activated to carry the beans away.

The loading technique is significant for two reasons. First, plaintiff's theory is that the dropping of soybeans from the overhead conveyor produced a very dusty atmosphere which at the time of the alleged explosion reached a critical ratio of dust to air capable of serving as an explosive. Second, foreign matter was commonly introduced into the system when the bulk beans were dumped into the outside pit, and plaintiff contends that a piece of "tramp" metal or rock passed through the overhead auger, fell through the open spout and, striking a spout baffle under the monitor, produced a spark which ignited the cloud of bean dust and caused an explosion.

To prove that such an explosion had occurred, plaintiff called eight of its employees and two expert witnesses to testify. There was also evidence with respect to other issues, but it is only with the testimony which tended to show that an explosion occurred that the court is now concerned.

The lay witnesses, i. e., the eight employees, were on the grounds at the time of the collapse of the beanhouse. Three were remotely placed, one of whom saw and heard nothing until the incident was over and two of whom saw nothing at the time but heard a noise. One of these described the noise as a loud report like an explosion and the other said that it sounded like a cannon firing. The remaining five witnesses were in the vicinity of the beanhouse and they variously described the noise as being similar to a sonic boom, to the coupling of two boxcars and to dynamite when being used for blasting stumps. One of them said it was an "awful noise" and another described it as a "tremendous noise."

Of these five witnesses who were in a position to see, one saw dust billowing in the air and saw the building shudder. Another saw a ring of dust or smoke and a piece of sheet metal and other debris rising in the air. Two men who were at the bean dump near the south end of the building saw the south wall swell outward and a piece of sheet metal [1] come off the south end of the monitor before they were engulfed in a cloud of bean dust.

The fifth witness was inside the beanhouse checking the temperature of the beans. He and another employee of plaintiff (who was not called to testify) were standing on the bean pile about twenty feet from the south end of the building. A repetitive noise "like a rock or something going in the conveyor (the overhead auger)" attracted his attention to the south end of the building at the monitor area. There he saw a quick flash like a match being lit and then quickly blown out, and at that point, "it got dusty." The substance of his testimony in this last respect is that, while it was always dusty when beans were being dropped into the beanhouse, the dust content of the atmosphere drastically increased after he saw the match-like flash of fire, so that it was almost impossible to see. Because of the dust, he and his companion could see only one way to escape, and that was through a new hole which had opened up where the conveyor entered the beanhouse. They climbed up and out, and reached the ground by climbing down the elevator. The witness was very frightened and he attributed this to the "awful noise" that he heard. Neither

---

1. These witnesses called these objects "tin".

man was injured, and the witness was unaware of having experienced any pressure or burning while inside the beanhouse, nor did he smell any unusual odors. He was unaware that the building had partially collapsed until after he was outside.

Approximately two-thirds of the beanhouse was damaged, as is indicated by the fact that in repairing the damage the northern 120 foot section was preserved and the southern 220 foot section was replaced. The south end had leaned inward and had pulled away from the bridge which supported the conveyor between the elevator and the beanhouse. Otherwise it was relatively unharmed except for a piece of sheet metal which was missing from the south end of the monitor. More severe damage occurred near the center of the beanhouse. The sidewalls had fallen outward, allowing beans to flow out onto the ground, and near the center of the building the monitor had sagged down with the roof, which in places rested on the remainder of the bean pile. Some windows and ventilators were broken.

The first expert witness whose testimony is relevant to the issue here was a chemist who had been given two samples of bean dust taken from this building for analysis. In one of these he found a certain amount of carbon. His testimony did not reveal any other characteristic of the samples which might be termed unusual.

The second expert was a mechanical and electrical engineer who was a partner in a firm devoted to analyzing industrial accidents and appraising losses. This witness had examined the remains of the beanhouse and on the basis of this examination, the statements of eye witnesses, and the testimony of the witnesses who preceded him at the trial, which he heard, he gave as his opinion that a bean dust explosion had caused the damage to the beanhouse.

In addition to the foregoing, two of plaintiff's employees testified to actions and statements of an employee of the defendant who was at the scene during the salvage operations. These witnesses stated that this individual arrived the day after the collapse of the beanhouse and remained on the scene for approximately one week, during which time he examined the wreckage. He took dust samples and sent them away for analysis, and the witnesses testified that he reported to them that the analysis showed that the dust had explosive capabilities. They also testified that he said that he had sent a telegram or telegrams to the defendant in which he expressed the opinion that the collapse of the building had been caused by an explosion, and that he had expressed the opinion that a bean dust explosion had occurred in the monitor area which had triggered the collapse of the building. His version, given by deposition, is in sharp conflict with the pertinent parts of this evidence.

■ A motion for judgment in accordance with a motion for a directed verdict is governed by the same principles as the earlier motion. Wieloch v. Rogers Cartage Co., 290 F.2d 235 (7th Cir. 1961); 2B Barron & Holtzoff, Federal Practice & Procedure § 1075 (Wright Ed. 1961). The evidence must be viewed most favorably for the party against whom the motion is made, Hover v. MacDonald Engineering Co., 183 F. Supp. 427 (S.D.Iowa 1960) and when so construed, if it can be said that fair-minded men might differ as to the conclusions of fact to be drawn from the evidence, the issue must go to the jury. Swift & Co. v. Morgan & Sturdivant, 214 F.2d 115, 49 A.L.R.2d 924 (5th Cir. 1954). But, when the evidence and the inferences to be drawn therefrom are such that reasonable men could reach only one conclusion, the court should direct a verdict, or, when this was refused by the court, enter judgment notwithstanding a verdict to the contrary. Seaboard Properties, Inc. v. Bunchman, 278 F.2d 679 (5th Cir. 1960).

The nature of the event which plaintiff sought to prove, an unexpected explosion, required that heavy reliance be placed on reasonable inferences to be drawn from the provable basic facts. As coun-

sel for plaintiff phrased it, the alleged explosion did not occur on the atomic proving grounds. There were no carefully placed instruments to sense and record heat, pressure and light phenomena so as to more or less conclusively demonstrate whether an explosion had occurred. Instead, plaintiff had to rely on evidence of the attendant circumstances and the results from which the ultimate fact might be inferred. If it may be legitimately inferred from that evidence that an explosion caused the collapse of the beanhouse, then judgment could not be entered contrary to the verdict of the jury.

▇▇▇▇ Evidence may be of such a character as to legitimately allow contrary inferences, in which case it would be the jury's duty to resolve the conflict. In judging the validity of the jury's resolution of that conflict, the court would have to accept the inference which supported the verdict. But if the conflicting inferences are evenly balanced, neither one is legitimate, and the jury's selection of one or the other could be based on nothing more than conjecture. Such evidence is probative of nothing and the party who depends upon it for an essential element of his claim for relief must fail. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819 (1933); Ralston Purina Co. v. Edmunds, 241 F.2d 164 (4th Cir. 1957). A legitimate inference, while impossible of definition with mathematical precision, may be said to arise when the evidence offered makes the existence of the fact to be inferred more probable than the non-existence of the fact. 2B Barron & Holtzoff, Federal Practice & Procedure § 1075 (Wright Ed. 1961). Further, an inference is not legitimate if it is in conflict with undisputed physical laws and facts or uncontroverted clear testimony. Lewis v. Nelson, 277 F.2d 207 (8th Cir. 1960); Kansas City Public Service Co. v. Shephard, 184 F.2d 945 (10th Cir. 1950); Shaw v. Edward Hines Lumber Co., 249 F.2d 434 (7th Cir. 1957).

Certain portions of the plaintiff's evidence here suffers from one or more of these vices. The testimony of the eight employees is at best equivocal insofar as it is relied upon to prove an explosion. In sum, they testified to hearing certain sounds and seeing certain events which are all consistent both with plaintiff's theory of an explosion and defendant's theory of structural failure. The sounds described could have originated equally as well from the breaking and collapsing of the large, all metal beanhouse, as from a dust explosion. Their visual impressions were to the same effect: the various ways in which they described the dust coming out of the building are consistent with both theories; the metal flying off from the building can be as readily explained by the tearing, stretching and compression of the metal skin as the building gave way, as it can by an explosion within; and the manner in which the building settled is no more enlightening. Their testimony and the inferences to be drawn from it are equally consistent with both theories and probative of neither. There is no basis for a rational choice between the two alternatives. Ralston Purina Co. v. Edmunds, supra.

The evidence which describes the position and characteristics of the remains of the structure after the event falls in the same category. Nothing contained therein suggests that the occurrence of an explosion was any more likely than collapse from structural failure. The same may be said of the testimony of the chemist who found carbon in one of two dust samples. That sample was taken from the beans in the damaged portion of the beanhouse, and carbon constituted 2% of the dust, by weight. No carbon was found in the dust taken from the other end of the beanhouse. As a result of the loading technique, the beans often contained significant parts of foreign matter. The burned residue of any such substance could easily be picked up in the bean harvest or in the transportation of the beans and transmitted to the beanhouse. In addition, acetylene

cutting torches were used in the damaged portion of the building in the salvage operations, and their use could account for the presence of carbon. Carbon itself is a basic element and the presence of varied kinds of foreign matter in the beans makes the presence of one more kind equivocal on the present issue.

If plaintiff relied on the evidence just reviewed, and nothing more, the jury could not have been permitted to infer that an explosion had destroyed the beanhouse. It would have been the court's duty to direct a verdict for defendant, and having declined to do so, to now enter judgment as if this had been done. If plaintiff is to avoid this fate now, it must do so on the basis of its second expert, the engineer, and the extra-judicial statements of defendant's employee, as related by plaintiff's witnesses.

Before examining this evidence, it is appropriate to discuss the physical laws which are applicable here. The parties agree, and the court would judicially note if they did not, that there are three prerequisites to a combustion explosion. First, there must be an explosive mixture. Second, the mixture must be adequately confined or contained. Third, the mixture, so contained, must be ignited. The parties also agree that a phenomenon known as a bean dust explosion can occur, and that at a certain minimum ratio of bean dust to air, an explosive mixture is obtained if the dust is dispersed and suspended in the air. Viewing the evidence most favorably for plaintiff, it must be taken as established that the soybean dust in the beanhouse, if suspended in the atmosphere in correct proportions, would provide an explosive mixture. And, evidence of a spark inside the building given by one witness who was there when the incident occurred would support a finding of a source of ignition. The verdict is on sound ground as to these two points.

Assuming then the presence of the first and third elements, i. e., explosive mixture and ignition, the difficulty here is with the second element, containment. Again, the parties agree that this element is a relative matter. If an explosive mixture is placed in a container and ignited, the occurrence of an explosion rather than mere burning depends upon the relationship between the amount of explosive mixture present and the quantity of space in the container. If there is present a sufficient amount of the explosive mixture, its ignition and rapid burning will produce pressure and temperature increases which will encounter the resistance of the container with enough energy to result in an explosion. But if the disparity in the two quantities is too great, or if the container is incomplete so that venting is available at too great a degree, the expanding forces will dissipate their energy before they reach the interior surfaces of the container, or in the case of excessive venting, will relieve their pressures by way of the venting at a rate sufficient to prevent an explosion. To illustrate, the vapor arising from a teaspoon of gasoline in the middle of an auditorium, although ultimately confined, would not produce an explosion if ignited; there would only be a flash fire, a harmless puff. But, the same vapors, enclosed in a pill bottle, could readily produce an explosion when ignition is supplied.

The containers available to plaintiff to support its theory of an explosion are limited. One possible way of providing containment would be to place the explosion within the confines of some smaller structure inside the beanhouse. Such an explosion chamber might support an explosion which would trigger the failure of an adjacent structural member that would in turn trigger the collapse of the building. The only such structures inside the beanhouse were the monitor and the overhead conveyor which it contained. As will be shown, these two areas and theories supporting both must be eliminated.

Most significant, plaintiff itself rejected these and instead predicated its case on the occurrence of an explosion below the monitor. Plaintiff's engineer testified to this effect and expressly denied that the explosion occurred up in

the monitor, and plaintiff's counsel adhered to this theory throughout the trial, as is apparent from the oral argument on the instant motion. These considerations are sufficient to eliminate the theory of an explosion within the monitor area. However, it should also be noted that the damage to the monitor is not reasonably traceable to an explosion but instead appeared to be solely the result of its displacement in the ultimate collapse. Finally, the theory of this witness, upon which plaintiff must stand or fall, was that an explosion lifted the roof and allowed the walls to give way, after which the roof settled back down. An explosion in the monitor area, *above the roof*, could not have this effect.

The only alternative is to place the explosion in the beanhouse proper, thus depending on the confines of the entire structure to provide the containment. Returning to the relative concept of containment, it is clear that if the volume of explosive dust had been large enough, the beanhouse itself could serve as the explosion chamber, but if the dust were not that extensive its ignition would generate, at most, only a flash fire, incapable of explosively causing structural damage —the pressure and heat increases would dissipate their energy at some point between the outer limits of the dust and the interior surfaces of the beanhouse.

In the circumstances disclosed here, obviously plaintiff had to introduce legally sufficient evidence that the beanhouse provided the necessary element of containment. This it did not do. In fact, no attempt was made to do so. Plaintiff's expert on this matter, the engineer, testified that the explosion did not involve the whole building but instead occurred in only a small area near its center. It was his opinion that if the whole building had been involved *it would have been totally destroyed.* If, as plaintiff's case requires, a small explosion exerting pressure on a localized part of the beanhouse is at least sufficient to cause the failure of that part of the structure, the conclusion is inescapable that this witness was correct in

the last stated opinion, for an explosion involving the whole building and depending on the beanhouse itself for the element of containment would undoubtedly exert proportionately magnified pressures on all interior surfaces, with correspondingly greater effect.

Also conclusive against this possibility was the undisputed survival of the event by the two men in the south, i. e., the damaged part of the beanhouse. They suffered no harm and the one who testified experienced no temperature or pressure increases, as he undoubtedly would have done if the expanding forces of such an explosion had occurred in, or passed through, his position. If such forces dissipated before they encountered this witness, they necessarily dissipated before they encountered the containment offered by the building.

Plaintiff is thus reduced to proving an efficient explosion of a limited nature occurring out in the open space near the center of the beanhouse, which utilized some containing factor *not shown to exist by any evidence* in the record. Although this is contrary to immutable physical laws, and therefore impossible, this is exactly what plaintiff attempted to do. This brings us at last to a detailed consideration of the testimony of plaintiff's engineer.

As aforementioned, he theorized a small local explosion near the center of the beanhouse, which did not involve the whole building and which did not extend up into the monitor area. He stated plaintiff's basic theory, that the dropping beans generated an explosive cloud of bean dust in the vicinity of the overhead spout then in use; that a piece of "tramp" iron or rock passed through the auger, and, on falling through the spout, struck a baffle immediately under the monitor; and that this contact created a spark which ignited the cloud and caused the explosion. Portions of his testimony on cross-examination are significant:

Q. And this cloud of dust was out in the open?

A. Yes.

Q. It was not confined or contained in any fashion?

A. *We assume not, no.* (Emphasis added.)

■ Discussing the analogy of a gas stove leaking gas, but leaking enough to cause only a puff instead of an explosion when ignited, the witness explained that this resulted from the relationship between the amount of vapor and the area which it occupied. His cross-examination continued, as follows:

Q. In other words, you had no containment in a large area, is that right?

A. That's right.

Q. And the explosion you are talking about is an explosion involving no containment in a large area, isn't it, Mr. ——————?

A. Yes.

In one breath the witness correctly explains the reason for the lack of explosion in the gas stove analogy, and in the next he agrees that the same circumstances apply to the explosion which he claims occurred in the beanhouse. In short, his opinion is in direct conflict with established physical laws, just as are the inferences plaintiff seeks to draw from the remainder of the evidence. In this light, the language of the court in Weinberg v. Northern Pacific Railway Company, 150 F.2d 645 (8th Cir. 1945), expressing a rule found in a multitude of decisions, is applicable to this opinion.

(O)pinions not supported by facts, and which are contrary to the physical facts and do violence to scientific principle or reason, are robbed of all probative value.

■ The extra-judicial statements of defendant's employee as related by plaintiff's witnesses are subject to the same limitation. Plaintiff offered evidence of these statements as representative admissions of a party-opponent which are probative of the occurrence of an explosion as alleged in the complaint.[2] Granting these statements dignified status as substantive proof of the elements of plaintiff's claim for relief, and viewing them in the light most favorable to that claim, they amount to no more than an opinion that a bean dust explosion occurred which resulted in the collapse of the beanhouse. Nothing in the statements attributed to this person supplies the deficiency in the evidence which the court regards as conclusive against the plaintiff's claim, i. e., *the absence of any evidence to show any adequate containment.* In short, his belief that an explosion occurred, conflicting as it does with the established physical laws and uncontroverted facts discussed above, is not probative evidence that an explosion did occur. Weinberg v. Northern Pacific Railway Company, supra.

■ In summary, the inferences which plaintiff asked the jury to draw from the evidence are equivocal and thus incapable of being legitimately drawn. In addition, the testimony of plaintiff's expert, the engineer, and the opinion of defendant's employee (said to have been expressed extra-judicially) are shown to be contrary to scientific principle and thus without probative value, and the explosion theory postulated by plaintiff is likewise shown to be in irreconcilable conflict with established facts and physical laws. There was no substantial evidence to support the jury's verdict for plaintiff, the motion for a directed verdict should have been sustained, and the present motion by the defendant for judgment in accordance with its motion for a directed verdict should, and will, be sustained, with judgment entered accordingly.

■ This leaves for consideration the alternative motion for a new trial, upon which a ruling should be made conditioned on reversal or vacation of the judgment for defendant notwith-

2. Plaintiff did not urge, nor did it attempt to prove, that this person had real or apparent authority to bind the defendant by statements admitting and accepting liability. See Restatement, Agency § 288 (2).

standing the verdict for plaintiff. Rule 50(c) (1), Federal Rules of Civil Procedure; Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940). In the event that it should be determined on appeal that this court has erred in holding that there was no substantial evidence to support a verdict for plaintiff, the verdict of the jury cannot stand. The analysis of the plaintiff's evidence heretofore made, as well as consideration of evidence produced by the defendant, compels the conclusion that the verdict is contrary to the overwhelming weight of the evidence. Therefore, if this judgment should be vacated or reversed on appeal, the verdict of the jury will be set aside and a new trial ordered.

An order will be entered in accordance with the foregoing.